GLEASON, RESPONDENT, *v.* MISSOURI RIVER POWER CO. ET AL., APPELLANTS.

(No. 2,876.)

(Submitted September 27, 1910. Decided November 29, 1910.)

[112 Pac. 394.]

*Electricity—Personal Injuries—Master and Servant—Contributory Negligence—Assumption of Risk—Pleading—Evidence—Insufficiency.*

Appeal and Error—Objections—Pleading—Necessity.
    1. An objection to the sufficiency of defendant's plea of contributory negligence need not be considered on appeal, where it was not raised in the trial court.

Negligence—Contributory Negligence—Pleading.
    2. Contributory negligence should be pleaded with the same degree of particularity required in pleading negligence.

Master and Servant—Injuries—Action—Pleading—Assumption of Risk.
3. The principles relating to the particularity and sufficiency of pleas of negligence and contributory negligence apply to the plea of assumption of risk.

Same—Injuries—Action—Jury Question—Contributory Negligence.
4. In an employee's action for injuries by contact with an electric wire, claimed to have been caused by defendant's negligence in not informing plaintiff as to the amount of current carried by the wire, etc., evidence *held* not to warrant a finding of contributory negligence as a matter of law.

Same—Injuries—Evidence—Insufficiency.
5. In a servant's action for injuries by contact with an electric wire, claimed to have been caused by his employer's negligence in failing to inform him of the strength of the current in the wires, evidence *held* not to sustain a verdict for plaintiff.

*Appeal from District Court, Silver Bow County; Jeremiah J. Lynch, Judge.*

ACTION by Edwin C. Gleason against the Missouri River Power Company and another. From a judgment for plaintiff and an order denying a motion for a new trial, defendants appeal. Reversed and remanded.

There was a brief in behalf of Appellants by *Mr. Wm. Wallace, Jr., Mr. John G. Brown,* and *Mr. R. F. Gaines.*  *Mr. Brown* argued the cause orally.

Plaintiff's entire case is without proof. It has been held that a mere scintilla of evidence is not sufficient to take a case to the jury, so it certainly should be held reversible error to allow a case to go to a jury or allow a judgment to stand where the evidence conclusively establishes not only that the plaintiff is without his scintilla, but that his theory is impossible. It has been repeatedly held that the maxim of *res ipsa loquitur* does not apply in master and servant cases, and expressly held to never apply in electric shock personal injury cases of this character. (*Looney* v. *Metropolitan Ry. Co.,* 200 U. S. 480, 26 Sup. Ct. 303, 50 L. Ed. 564; *Beebe* v. *Transit Co.,* 206 Mo. 419, 103 S. W. 1019, 12 L. R. A., n. s., 760.)  We claim the jury were so biased and so influenced by passion and prejudice as to absolutely disregard the evidence and their instructions and simply find a verdict on no evidence. This being true, this

court is not only entitled to go over the facts, but, in this case, determine them. The testimony of the plaintiff himself makes the question of the sufficiency of the proof in this case a matter of mere mathematical calculation (as it is), and where the evidence is of such a character that the appellate court stands on an equal footing with the jury in considering it, the appellate court should review it, and where the verdict is contrary to the evidence, grant a new trial. (*Elwood Mill Co.* v. *Jackson,* 11 Ind. App. 181, 38 N. E. 824; *Hazard Powder Co.* v. *Somerville Mfg. Co.,* 78 Conn. 171, 112 Am. St. Rep. 144, 61 Atl. 519; *Lovitt* v. *Russell,* 138 Mo. 474, 40 S. W. 123; *Casto* v. *Baker,* 59 W. Va. 683, 53 S. E. 600; *Miss. Cotton Oil Co.* v. *Starling Co.* (Miss.), 23 South. 648; *Nelson* v. *Big Blackfoot Co.,* 17 Mont. 556, 44 Pac. 81; *Newell* v. *Whitwell,* 16 Mont. 243, 40 Pac. 866; *Landsman* v. *Thompson,* 9 Mont. 182, 22 Pac. 1148; *Northern P. Ry. Co.* v. *Schimmell,* 6 Mont. 161, 9 Pac. 889; *Knipe* v. *Washoe C. Co.,* 37 Mont. 161, 95 Pac. 129; *Walsh* v. *Mueller,* 16 Mont. 180, 40 Pac. 292; *Boe* v. *Lynch,* 20 Mont. 80, 49 Pac. 381; *Meyers* v. *Savery,* 19 Mont. 329, 48 Pac. 390.) Where the verdict rendered in the trial court is without any support in the evidence, it is the duty of the appellate court to so declare, and set aside the judgment based on it. (*Illinois Steel Co.* v. *Kinnare,* 93 Ill. App. 83; *Rock Island etc. Ry.* v. *Dormandy,* 103 Ill. App. 127; *Lake Erie & W. R. Co.* v. *Juday,* 19 Ind. App. 436, 49 N. E. 843; *Zienke* v. *Northern Pac. Ry.,* 8 Idaho, 54, 66 Pac. 828; *Thomas* v. *Power Co.,* 7 Idaho, 435, 63 Pac. 595; *Haenky* v. *Weishaar,* 64 Kan. 717, 68 Pac. 610; *Munk* v. *Kanzler,* 26 Ind. App. 105, 58 N. E. 543; *Archambault* v. *Blanchard,* 198 Mo. 384, 95 S. W. 834; *Johnson* v. *Burnes,* 39 W. Va. 658, 20 S. E. 686; *Ranney etc. Co.* v. *Hanes,* 9 Okl. 471, 60 Pac. 284; *Easterly etc. Co.* v. *Berg,* 52 Neb. 147, 71 N. W. 952.) The simple fact that an accident happened is not proof of the master's negligence. The servant, to recover, must do more. He must establish that the accident happened from negligence of the master and that that negligence is what he complains of. Neither of these elements has been shown

here. We are simply left to presume a fact in the face of un-
disputed facts and presumptions to the contrary. This cannot
be. (*Winncott* v. *Orman,* 39 Mont. 339, 102 Pac. 570; *Shaw*
v. *New Year Gold Min. Co.,* 31 Mont. 138, 77 Pac. 515; *Olsen*
v. *M. O. P. Co.,* 35 Mont. 400, 89 Pac. 731; *McGowan* v. *Nelson,*
36 Mont. 67, 92 Pac. 40; *McAuley* v. *Casualty Co.,* 37 Mont. 256,
96 Pac. 131; *Monson* v. *Copper Co.,* 39 Mont. 50, 133 Am. St.
Rep. 549, 101 Pac. 243; see, also, *Patton* v. *Texas etc. Ry.,* 179
U. S. 658, 21 Sup. Ct. 275, 45 L. Ed. 361, and *Duncan* v. *Rail-
way,* 82 Kan. 230, 108 Pac. 101, a well-considered case from
Kansas.)

The second serious question raised in the motion to direct
the verdict was the question of plaintiff's contributory negli-
gence. This we claim was established in two ways. First:
Plaintiff was guilty of contributory negligence in violating a
rule of the company by not waiting until after 12 o'clock when
the motor using the current would be shut down. Secondly:
He adopted the dangerous method of working. To have bridged
by "jumpering" was safe, while to work without bridging was
dangerous.

Electricity is known to be a highly dangerous unseeable, un-
knowable element or fluid. The rule of law that a master
must use care commensurate with the danger applies with ad-
ditional force to the master whose employment requires work
with such a dangerous thing. With equal force does that rule
apply to all who come in contact with it. "Knowledge that
wires are liable to get out of repair, and when out of repair
that they are dangerous to life, is something entering into the
question of care as it applies to both parties." (*Gloucester
Electric Co.* v. *Dover,* 153 Fed. 139–141, 82 C. C. A. 291.)

Plaintiff's obedience of the rule referred to would have en-
abled him to work on a line that had no current—no motor
using current—which he well knew, but, disregarding both the
rule and the danger, he goes ahead and in consequence finds a
live wire and is injured. We insist that his violation of the
rule was contributory negligence defeating recovery. (Joyce on

Electric Law, sec. 678; 5 Thompson on Negligence, secs. 5395 *et seq.;* Elliott on Railways, sec. 1282; 26 Cyc. 1160–1162.) And by violation of a rule a servant takes upon himself the risk of all the consequences which might from his knowledge and experience be expected to result from such violation. (*Boucher* v. *Oregon R. & N. Co.,* 50 Wash. 627, 97 Pac. 661; *Lake etc. Co.* v. *Craig,* 80 Fed. 488, 25 C. C. A. 585; *Lake etc. Ry. Co.* v. *Wilson,* 88 Tenn. 316, 12 S. W. 720.)

The second, and perhaps the stronger, proof of plaintiff's contributory negligence was his adopting the dangerous method of working without "jumpering" the fuse.

"Jumpering" is a term commonly used among electricians, and means literally bridging across. Electricity is like water, in that it flows along the course offering the least resistance; so, too, is it like water in that if it has pressure (voltage) behind it, it will jump farther out into space. Especially is this true if in addition to pressure there is some exposed conductor near. The current forced out by the pressure jumps to the near conductor in its endeavor to reach the ground. Linemen well know this, so the custom has grown from experience and instruction to "jumper" around a place where you have to work; that is, put wires in around the place and thus furnish a conductor for the current. Where a servant elects to take the more dangerous of two methods open to him, his contributory negligence defeats recovery in ordinary cases. This being the usual rule, how much more applicable it becomes where he is handling electricity, where his care must be measured by the great danger he handles. To allow servants in such cases to recover when they have disregarded rules, experience and common sense would be to require the masters to follow every detail of electrical work and render impossible the conduct of the great growing industry of furnishing electrical power. (Joyce on Electricity, p. 1051; *Frick* v. *Salt Lake etc. Co.,* 18 Utah, 493, 56 Pac. 90; *Douglas* v. *Southern Pac. Ry. Co.,* 151 Cal. 242, 90 Pac. 538; *English* v. *Railway Co.,* 24 Fed. 909; *Smart* v. *Electric Co.,* 47 La. Ann. 869, 17 South. 346; *Kilroy* v. *Foss,* 161 Mass. 138, 36

N. E. 746; *St. Louis etc. Co.* v. *Burke,* 12 Ill. App. 372; *Gowen*
v. *Harley,* 56 Fed. 973, 6 C. C. A. 1190; *Morris* v. *Railway Co.,*
108 Fed. 747, 47 C. C. A. 661.)

In behalf of Respondent, *Messrs. Maury & Templeman,* and
*Mr. J. O. Davies* submitted a brief.  *Mr. Templeman* argued the
cause orally.  On resubmission of the cause, both *Mr. Temple-
man* and *Mr. Maury* presented oral arguments.

The burden of alleging and proving contributory negligence
as a defense was on the defendants; as was also the burden of
alleging and proving that the plaintiff was injured through a
risk assumed.  (*Nord* v. *Boston & Mont. M. Co.,* 30 Mont. 48,
75 Pac. 681.)  The allegation found in the answer as to con-
tributory negligence is so short that we quote it: "That the
injuries, if any, sustained by the plaintiff, were due to, and
approximately caused by, his own contributing fault and care-
lessness."  And likewise the allegation as to assumption of the
risk is equally as short and as completely without pith.  We
quote that: "That the injuries, if any, sustained by the plaintiff,
were due to and caused by dangers, the risk of injury for which
plaintiff had theretofore assumed."  Here we find nothing but
two legal conclusions.  In order to charge a defendant with
negligence, it must be alleged that he permitted some omission,
or did some act, and such act or such omission must be charac-
terized as negligent.  (*Pullen* v. *City of Butte,* 38 Mont. 194,
99 Pac. 290, 21 L. R. A., n. s., 42.)  It is elementary that:
"When contributory negligence is pleaded as a defense, it must
be alleged in the same manner that negligence must be alleged
as a ground of recovery.  The act or omission must be stated,
must be characterized as negligent, and must be shown to have
contributed to the injury complained of."  (Phillips on Code
Pleading, sec. 503; *Bliss* v. *Walcott,* 40 Mont. 492, 135 Am.
St. Rep. 636, 107 Pac. 423.)  Of course the plea is bad, also,
under the rule laid down in *Birsch* v. *Citizens' Elec. Co.,* 36
Mont. 574, 93 Pac. 940.  Under the interpretation of the Code
provisions as to simple and concise language as found in the

opinion of the *Pullen Case,* the plea of assumption of the risk as found in the answer is without utility. It states no fact.

Proof of the existence of an object, condition, quality or tendency at a given time raises a presumption of fact sufficient to support a finding that it continued, or until shown to be changed. (Moore on Facts, sec. 546, and cases cited; Lawson on Presumptive Evidence, rule 29; *Gernau* v. *Oceanic S. N. Co.,* 66 Hun, 633, 21 N. Y. Supp. 371; Revised Codes, sec. 7962, subd. 32.) The excessive amperage was there when the 200 ampere fuses removed by Gleason, given to and inspected by Mr. Case, were blown. It is presumed to continue. "The jury are not bound to decide in conformity with the declarations of any number of witnesses * * * against a presumption." (Id., sec. 8028, subd. 2.) The presumption was strengthened by the failure of defendants to produce proof against it in the way of meter readings of two hundred and seventeenth day of 1907, when they claimed the ability to show the amperage at all times. (Moore on Facts, sec. 579.) Mr. Case and the company had the means of knowing of the excessive amperage when the blown 200 ampere fuses were brought in to the former the day before the injury. Means of knowledge may be sufficient in law to impute actual knowledge to anyone. (Thompson on Negligence, sec. 3782.) The fact that under the same conditions accidents and injuries have not previously happened is no proof of freedom from negligence. (Thompson on Negligence, secs. 7658, 7872.)

Counsel for Appellants filed a brief in reply.

The plea of contributory negligence as well as the plea of assumption of risk interposed in this case were sufficient to raise an issue, did in fact raise an issue which was tried and without objection submitted to the jury. Hence these pleas both answered every requirement that could be made of them, and beyond doubt the jury considered this contributory negligence, and so far as they are concerned, there being no objection to the testimony, this court has held that the plea would

be deemed amended so as to make the admission of the testimony proper. (*O'Brien* v. *Corra-Rock Island Min. Co.*, 40 Mont. 212, 105 Pac. 724.)   The form used has express authority in the law, and is verbatim from a decision approving it (*Neier* v. *Railway Co.* (Mo.), 1 S. W. 387), and has been approved by other courts. (*Chesapeake etc. Ry. Co.* v. *Smith*, 101 Ky. 104, 39 S. W. 832; *Stewart* v. *Railway Co.*, 34 Tex. Civ. 370, 78 S. W. 979; *Metcalf* v. *Railway Co.*, 156 Ala. 240, 47 South. 158; *DiMarcho* v. *Iron Co.*, 18 R. I. 514, 27 Atl. 328.) Furthermore, where evidence of contributory negligence was admitted without objection, that puts it before the appellate court, although it was not pleaded. (29 Cyc. 581, 582; *Denver etc. Ry. Co.* v. *Smock*, 23 Colo. 456, 48 Pac. 681.)   Even those states that require the facts constituting the contributory negligence to be alleged hold that a general averment will be held sufficient for the introduction of testimony unless objected to in proper time or in the proper manner. (29 Cyc. 582; *Conrad* v. *De Montcourt*, 138 Mo. 311, 39 S. W. 805; *Borden* v. *Falk*, 97 Mo. App. 566, 71 S. W. 478.)   And it has been held that a motion or demurrer should be interposed to such a defense or it will be deemed sufficient. (*Chicago etc. Co.* v. *Oyster*, 58 Neb. 1, 78 N. W. 359; *Wall* v. *Buffalo Waterworks Co.*, 18 N. Y. 119.)   Further, this court has frequently held that where a party has acquiesced in a theory upon a trial, he cannot on appeal insist that it was the wrong theory or not before the appellate court. (*Dempster* v. *Oregon S. L. R. R. Co.*, 37 Mont. 335, 96 Pac. 717; *Durfee* v. *Harper*, 22 Mont. 354, 56 Pac. 582; *Wortman* v. *Mont. C. Ry. Co.*, 22 Mont. 266, 56 Pac. 316; *Talbott* v. *Water Co.*, 29 Mont. 17, 73 Pac. 1111; *Hendrickson* v. *Wallace*, 29 Mont. 504, 75 Pac. 355; *Robinson* v. *Helena L. & R. Co.*, 38 Mont. 222, 99 Pac. 837; 21 Ency. of Pl. & Pr. 664; *Moyse* v. *Northern Pac. Ry. Co.*, 41 Mont. 272, 108 Pac. 1066.)

MR. JUSTICE SMITH delivered the opinion of the court.

The complaint in this action, after alleging the corporate character of the Missouri River Power Company, reads as follows:

"That on the fifth day of August, 1907, and for some weeks previous thereto and for some weeks thereafter, the company had placed in complete and absolute control of its power station, near the High Ore mine in Silver Bow county, the defendant S. L. Case. At the times in this paragraph mentioned he was the superintendent over all the men working for the company in and about the said power station and in and over and about the lines carrying electric current for the company to its patrons in the city of Butte from the said power station; that on August 5, 1907, this plaintiff by the mutual agreement of himself with the company was the servant of the company, employed by the company, and engaged by the company to do line work. On the said fifth day of August, 1907, the said S. L. Case negligently gave to this plaintiff a negligent order, and negligently ordered the plaintiff to do certain work of great danger to the plaintiff, and the plaintiff obeyed said order, and was greatly injured in consequence thereof, partly, but also greatly injured in consequence of the negligence of the company hereinafter set out. The two negligent acts, to-wit, that of the defendant Case, and also that of the defendant company, concurred to produce the injury hereinafter set out, and each was a direct and a proximate cause thereof. The negligence of defendant Case was as follows: He ordered this plaintiff to work on one of the wires of the defendant company at a point about two blocks east of the Western Iron Works in Silver Bow county. The said wire was represented by the said Case to the said plaintiff to be carrying a current of electricity not in excess of twenty-six hundred and fifty (2,650) volts, and not in excess of sixty (60) amperes, and if this representation had been true, the plaintiff would not have been injured, for that the plaintiff would have worked in safety with the methods which he did use to insulate himself on a wire which carried only 60 or less amperes and 2,650 or less volts; but in truth and in fact the said wire was carrying a much larger amperage than 60, to-wit, it was carrying an amperage of about 200 amperes. This fact was unknown to the plaintiff, nor could the plaintiff, with due

diligence, have ascertained that fact; but this fact was known to the defendant, S. L. Case, or he, by the exercise of reason- able care, could have and would have discovered and known the same. The negligence of the company consisted in that the said wire was designed to carry, and was supposed by plaintiff and the other linemen to carry, and there was being used off of the said wire, a current not in excess of 60 amperes and 2,650 volts, but for a considerable period of time before the fifth day of August, 1907, and on the said day the company had negligently allowed to escape into the said wire, and there was escaping and going through the said wire at the said time, a current equal to 2,650 volts and about 200 amperes.

"That when the plaintiff went to work at the said point in- duced by the company and by S. L. Case to believe that there was only a current of 2,650 volts and 60 amperes, he suffi- ciently and properly and carefully insulated himself for protec- tion against the current which the company and S. L. Case had led him to believe was there; but he was in no wise insulated nor protected from the current which was actually in the said wire as aforesaid, and by reason of the said excessive current, and the said negligent order, and plaintiff's careful obedience thereto, the plaintiff was grievously burned by the said current, sufficient in all respects to do great bodily injury to life and limb of men. That by the said burnings, the said defendants did injure the plaintiff's right ear so that he is disfigured for the remainder of his natural life; did burn the plaintiff on his left arm whereby he suffered great pain and injury; did burn the plaintiff for a space of about three inches wide all the way and extending from the wrist almost to the elbow on the right arm; did so burn the plaintiff's right hand that he can never straighten any of the fingers in the right hand save only when the wrist is at one certain angle with the radius and the ulna; and thereby did permanently and for all times render almost worthless the right hand of the plaintiff, and seriously impair his earning capacity in his trade as an electrical appliance worker for the remainder of his natural life. That the plain-

tiff on the said fifth day of August, 1907, was without negligence on his part and using all care and precaution for his own safety."

A general demurrer to the complaint was interposed and overruled. Thereupon the defendants answered jointly, admitting that Case "was the company's superintendent at its power station near the High Ore mine"; that the plaintiff was in the employ of the defendant corporation, for hire; denying that Case at any time "negligently gave him a negligent order, or negligently or otherwise ordered him to do work of great danger"; admitting that plaintiff "while at work at a point near the Western Iron Works received certain injuries," but denying "that the injuries were due to or occasioned by any negligence or negligent omission on the part of the defendants or either of them." Defendants also alleged affirmatively, as follows: "That the injuries, if any, sustained by the plaintiff were due to and proximately caused by his own contributing fault and carelessness"; and were "due to and caused by dangers, the risk of injury from which plaintiff had theretofore assumed." There was a reply putting in issue the affirmative allegations of the answer. The cause was tried to a jury, which returned a verdict in favor of the plaintiff, and against both defendants, for the sum of $8,000. Judgment was entered for this sum, whereupon the defendants moved for a new trial. The court entered an order denying the motion, on condition that the plaintiff remit $2,000 from the judgment. This he did. The appeals are from the judgment and the order denying a new trial.

Plaintiff testified at the trial: "My position with the company was that of lineman and wireman. On August 4, 1907, I replaced a fuse at a point about two blocks east of the Western Iron Works. I replaced a wire in the place of a fuse at Mr. Case's request. The day before I took a fuse off of there and gave them to him. They had been blown. I presume that excessive current had blown them. I examined one of these fuses about thirty-two days afterward, after I was able to go to the

place. As to the amperage of the fuse taken out on Sunday, August 4, 1907, I found that the fuse had been reloaded with a wire sufficient to carry 200 amperes. I was sufficiently acquainted with electrical work to know that this fuse carried 200 amperes without breaking down; that much or more. This time, thirty-two days after I was injured, was the first time I knew they were 200-ampere fuses. On August 5, between 8 and 9:30 o'clock in the morning, I went to Mr. Case's office, and he said that I should take Mr. Collins over the line and show him our customers. He then told me to go to the place that I had removed the fuses the day before, and put in the wires and take out the wires, and to put fuses back in place of them, to solder a No. 6 wire over the fuse that had been blown, and to put in the same fuse that I had given to him the day before. He told me that the wire was perfectly safe to work on, and that the current did not exceed 60 amperes at any time, and that a 60-ampere fuse would be able to carry it. I went to the place, climbed the pole, took out the wires and replaced fuse No. 1 on the right-hand side, and took my pliers and took hold of No. 2 and shoved it in No. 2 fuse-box, and then went and took hold of No. 3, and there was an explosion. It blew the fuse. A piece blew out; it burned out in the form of an arc, which was caused from exploding the fuse. The arc was so severe it burned my arm and face. At that time the voltage on that line was 2,650. There was no fault to be found with the voltage. *At that time a No. 8 wire was carrying that current into the fuse-box. A No. 8 wire would carry safely and continuously 60 amperes. It would not carry any more without fusing, not if it was carrying a continuous load. It would not carry 200 amperage.* The size of wire which is proper and useful to carry 200 amperage is a No. 00. A No. 8 wire is a great many times smaller than a No. 00. These wires you show me are the three wires that I had put in the fuse block that Mr. Case ordered me to. These wires will carry about 75 amperes without breaking down—without being burned up. They will not carry any more of a continuous current. The pressure on

the line was in fact 2,650 volts and 200 amperes. I know that from the fact that it had blown a 200-amperage fuse on the morning previous. My opinion as to the safety or danger of a man working on that pole replacing those fuses on a voltage of 2,650 and an amperage of 200 is that it would be very dangerous and could not be done. Before I saw the explosion and the sheet of flame, I had no knowledge that the wire carried 200 amperes. An arc is an instantaneous movement of current from one conductor to another. It jumps the intermediate space. *There could have been no arc there, or formed there, if the amperage had been 60 amperes or less. Sixty amperes or less could not have caused any explosion to blow the fuse as this did. Two hundred amperes were present to cause that explosion.* By voltage, I mean the pressure on the wire. Amperage is the measurement of the current. Voltage is the pressure, and amperage is the amount of the current used. If we take it in the form of water, voltage is the pressure on the main, and the amperage is the number of gallons that comes through the main; that would be a good comparison. When I placed the wires in the fuse block I did not get any flash. I took the three that had been blown out and soldered across them a piece of No. 6 wire, which is a little larger than a No. 8. When the explosion occurred I had not got the third fuse up to the block; the second had simply been placed in. The third fuse at no time touched either terminal of the fuse block—it never got anywhere near the block; it was not within a foot of the block. I arrive at the amperes in that wire from the very fact that it had blown the fuse that would carry 200 amperes the day before, and from the intensity of the arc I know 60 amperes of current could not possibly cause that. I did not put jumpers across in place of the fuse or around the fuse blocks.''

James Collins, who was present at the time of the accident, testified for the plaintiff: ''When the arc started, Gleason was putting on the second fuse; I do not know what became of the third fuse. We always try to avoid shutting down a customer. The only way in case of removing a fuse block is to jumper

across—that is, to bridge across the fuse block so that when you remove the fuse the current would have some means of passing through, so that there would be a continuous current.   If you put a jumper across and remove the plug I don't think there is any probability of getting an arc.   If you don't jumper across and remove the block while the current is going through, sometimes you will get an arc.   I have removed lots of these blocks and never got an arc to speak of.   I went back in the afternoon and removed all of the old fuses that were burned out and put in new ones.   I did not get an arc when I made the connection, and I did not jumper it across.   Linemen know from personal experience that jumpering is the safer method. I know how Gleason was making this change.   That is the way I myself would have done it.   The question of placing a jumper on before making the change depends on the current as to whether it is safe or not.   Two hundred amperes would make an arc sufficient to burn a man; 60 amperes would not hurt a man at all.''

E. M. De Mars testified for the plaintiff that he was an electrical worker of twenty-two years' experience and was foreman of an electrical company.   Being shown the fuse which plaintiff claimed to be the third one in question, he testified: ''Three hundred amperes would not explode this; it would carry 300 continuously.   I would say that it would take 1,000 amperes to explode this fuse, and a voltage of 2,650.   There is a difference between blowing a fuse and exploding it.   It would take 100 amperes to blow the copper wire on the back.   The soldering would melt and the fuse, but the copper wire carries great heat.   High amperage has the effect of burning the wire. Bridging or jumping across is considered the safe way by workmen for a number of years.   From my experience and from my work for the last ten years I would say that it was safer to furnish a way for current to flow, rather than to have the opportunity to form an arc.   The safety or danger of putting in those fuse blocks with or without jumpers depends entirely on the current in the wire.   There is always danger in high-tension pressure.''

For the defendant, James C. Dow testified that continuity of service is the main aim of an electrical service plant. "It is impressed on all the employees. Taking out a fuse would break the continuity of service. You can preserve continuity of service by jumpering around a fuse; you always try to preserve continuity of service when a lineman is working."

W. S. Guthrie, an electrical engineer, testified: "As I remember it, there were four customers on the line that day. The customers were the Red Metal Company, which was behind the place where Gleason was working, the Western Iron Works was on the same line, the Crescent Creamery, the Western Lumber Company. I do not know whether the Butte Reduction Works was on the far end of it at that time or not. From my experience, you would get a fearful arc by breaking the contacts on a line which is carrying 2,650 volts and 60 amperes. An arc which would be formed at the same voltage and 200 amperes would be just that much worse. The amperage has nothing to do with an arc. One way to preserve continuity of service is to jumper with a copper wire. You cannot pull a fuse out without getting an arc, but if you jumper you get no flash or arc. The safer way is to jumper. It is not customary when you send a man to change a fuse to tell him whether to jumper it or not. He is supposed to use his own judgment whether he should jumper it or not, and to do everything he can for his own safety."

S. L. Case testified: "I am one of the defendants. There were probably half a dozen customers on that line altogether. I think there were six. The Leonard and Rarus were on that line. The Rarus load was about 1,350 to 1,400 horse-power. The amperage of the Rarus would be approximately 270 and some odd. The Leonard was in addition to that, as was also the Western Lumber Company, the Western Iron Works, the Crescent Creamery, and the Home Baking Company. At 1 o'clock P. M. of that day the amperage on that line would be approximately 480. Gleason did not bring the fuses that had been burned back to me, and I did not tell him as to whether

or not there was an additional 140 amperes of current flowing over the line from 11 o'clock Sunday morning up to the time of the accident. I will say there was no additional current flowing on that line during that time. If there had been I would have known it.''

E. M. De Mars, recalled for the defendant, testified that in his judgment an amperage of 60, under the circumstances shown, would not cause an arc.

James Keefe, city electrician of Butte, testified: ''Of course, every man does his work a little different, but I would put a jumper around in order to be safe, if I were sent out on a wire with a current which I knew contained 2,650 volts and 60 amperes and the line had three fuses which I was to take out and replace. By jumpering you will prevent an arc.''

L. L. Quigley testified: ''On August 5, feeders 4 and 5 were cabled in together going into the station at that time. On No. 4 there would be about 220 amperes and on No. 5 there would be close to 500—480 to 500. No. 4 and 5 were headed together at the bridge. The Rarus and Leonard were working at 11 that morning. The load that was going over No. 4 feeder was the same load that was going out over there for two or three days previous.''

W. L. Miller testified: ''In August, 1907, I was employed by the Missouri River Power Company and had charge of the Butte station which is here in question in this case. I was very well informed at that time with the customers, with their leads and loads that were fed from the Butte steam plant. I was familiar with the load which was used by the Western Lumber Works on and before August 5, 1907. It was taking practically nothing at that time. I am familiar with the current which was going to the Crescent Creamery; it was in the neighborhood of 1 ampere; the Home Baking Company was taking about 1 ampere; the current which was being fed to the Western Iron Works was about 5 to 10 amperes. About 10 amperes I will say from my knowledge and experience would be down at the junction pole at the Western Iron Works. The amperes which

went to the Rarus mine at that time was 140 amperes. There were 10 amperes going down over this line to the Western Iron Works in that direction, feeding the customers. It divided itself equally between the two feeders; therefore there would be 5 amperes on it. The total current for the Rarus mine and which it was taking, was 340 amperes. A smaller wire will fuse quicker for an equal current. If the same current passed through a No. 6 wire and a No. 8 wire, the No. 8 would fuse first. The Rarus was running on the day in question. The Leonard mine on the morning of August 5th was using 410 amperes, and the Rarus 340 amperes. The precipitating plants with the other small customers were using about 10 amperes. The entire amperage of the three wires on which Gleason was working would be the sum of the continuous current going to the Iron Works and the Crescent Creamery.''

The foregoing is by no means all the evidence, but it is sufficient to illustrate the situation as presented to this court.

1. Appellants contend that the evidence shows, as a matter of law, that plaintiff was guilty of contributory negligence. On the part of the respondent it is urged that there is no sufficient plea of such a defense. The latter question might be disposed of by saying that it was not raised in the court below. However, as there must be a new trial, we think this court should express its views on the subject.

It has long been settled law in this state that the presence of contributory negligence is a matter of affirmative defense. (*Schroder* v. *Montana Iron Works,* 38 Mont. 474, 100 Pac. 619.) This being so, it follows that contributory negligence should be pleaded with the same degree of particularity as is required of the plaintiff in pleading negligence on the part of the defendant. The manner of doing so was discussed at length by this court in the case of *Pullen* v. *City of Butte,* 38 Mont. 194, 99 Pac. 290, 21 L. R. A., n. s., 42. (See Phillips on Code Pleading, sec. 503.) The same reasoning applies to the plea of assumption of risk. We are of opinion that the facts in the case would not warrant the court in deciding, as a matter of law, that plaintiff was guilty of contributory negligence.

2. It is said that the evidence is insufficient to justify a verdict for the plaintiff. The question presented was found so difficult of solution that a second argument was ordered and has been had. The cause is *sui generis.* We are unable to determine the effect of the testimony. No question of the credibility of witnesses has been or could be regarded. We have considered only the uncontradicted testimony, principally that of plaintiff himself; and yet we are unable to determine its meaning. No importance can be attached to the fact that the plaintiff had a verdict below or that the district court denied a new trial. The members of this court are in as favorable a situation to analyze the testimony as were the district judge and the jury. Indeed, we have had the benefit of two exhaustive and interesting arguments by learned counsel, the second after they had been fully advised of the particular difficulties confronting the court and had confessedly subjected the evidence to the closest scrutiny, in the light of technical knowledge of the mysterious and intricate workings of electrical currents, acquired after the cause was first argued. We regret that the expert testimony given by counsel at the second argument is not in the record. To illustrate the situation presented: The plaintiff displayed considerable knowledge of electricity. He testified as an expert to a certain degree. He declared positively that the pressure on the line upon which he was working was 200 amperes, and gave the reason for his conclusion. He also said that an amperage of 60 would not form an arc such as was caused by this current. Let us assume that this testimony was sufficient *prima facie* to establish the fact. Again he declared that a No. 8 wire was carrying the current into the fuse-box, and that a wire of that size would carry "safely and continuously" 60 amperes and no more, without fusing. He used the expression "not if it was carrying a continuous load." And again he said: "It would not carry 200 amperes." If, as he said, the No. 8 wire leading into the fuse-box would not carry 200 amperes of current, but only 60, how can it be possible that 200 amperes got into the fuse-box? How did that amount of current get across the No. 8 wire? That the load was a continuous one is shown by the

allegations of his complaint wherein he avers that for a considerable period of time before the fifth day of August the company "negligently allowed to escape into the wire, and there was escaping into and going through said wire at the said time, a current equal to about 200 amperes." Does not the testimony last quoted nullify the effect of his previous declaration?

Again, it is said that the defendants' witnesses supplied testimony showing that the entire load of electricity leaving the steam plant to supply the Rarus and Leonard mines and other works could, under certain conditions, escape into the wire leading to the fuse-box. Counsel for the respondent emphatically declare this to be the fact, while appellants' counsel, with equal emphasis and certainty of expression, has informed the court that it is not true. Both claim to base their conclusions upon the evidence. We are unable to determine which is correct. The evidence is too meager to enable us to form a conclusion.

Counsel also disagree as to whether the evidence shows that the pole upon which plaintiff was engaged was at the junction of the "main feeder" supplying the Rarus and Leonard mines and the line running directly to the Western Iron Works, or whether it was at a point beyond that at which the current left the "main feeder" to go to the mines. And there are many minor differences of opinion, all of which are important. In an ordinary case we could probably determine, with more or less certainty, what the testimony disclosed. But in this case we are unable to do so, and are therefore forced to the opinion that the verdict of the jury was a mere guess. If we cannot understand the evidence, with the able assistance afforded by counsel, it seems fair to say that the jury could not have done so. We do not intend to reflect on our own intelligence or that of the jury. The evidence is simply insufficient to warrant the drawing of logical conclusions. We have no doubt that upon a retrial experts can explain away the difficulties now surrounding the case. Special questions should be submitted to the jury, to the end that the facts may be definitely settled before judgment is entered.

The judgment and order appealed from are reversed, and the cause is remanded for a new trial.

*Reversed and remanded.*

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE HOLLOWAY concur.